HUSTEDE et al. v. ATLANTIC REFINING CO.

(District Court, E. D. Pennsylvania. July 5, 1895.)

No. 5.

LIABILITY OF WHARFINGERS—FIRE COMMUNICATED TO VESSEL BY FLOATING OIL.
 A vessel going for a cargo of oil to an oil wharf, where the water is always and unavoidably partially covered with floating oil, assumes the risks incident thereto, and the wharfinger is not liable for damage occasioned to her by fire communicated from premises not owned by him, by means of floating oil that escaped from sources over which he had no control.

This was a libel by Hustede and others, owners of the steamer Felix, against the Atlantic Refining Company, to recover damages caused to the vessel by fire while lying at defendant's dock.

Henry Flanders and Edward F. Pugh, for libelants.
John G. Johnson, for respondent.

BUTLER, District Judge.    The respondent is engaged in refining, and dealing in oil, at Point Breeze, Philadelphia, having two plants located on the side of the Schuylkill river, about half a mile apart, (the one above the other) connected by lines of pipe, placed under ground about 100 feet back from the river, and about 50 feet above it, through which oil is passed.    It maintains wharves in the vicinity, of its works for the accommodation of vessels engaged in the trade, charging compensation for their use.

About midway between the plants a pump house of the Point Breeze Gas Works is located, at the water's edge, the works of which are driven by steam.    It is built upon piles, with a wharf in front, cribbed on the water side.

On the 28th of October the Felix, under charter to carry oil from Philadelphia, and subject to the respondent's orders as respects loading, was by the latter's direction docked at its lower wharf.

The water in that vicinity, and for a considerable distance above and below Point Breeze, was at the time, and ever since the commerce in oil there became large has been, partially covered with oil, the quantity increasing with the increase of the trade, which for many years past has been large, others besides the respondent (including many carriers by water) being engaged in the business.

On the morning of October 30th, while the Felix awaited her cargo, a fire was started in the pump house, (preceded by an explosion) which was carried so rapidly down the river that it communicated with the Felix and other vessels around her, before she could be removed; in consequence of which she was substantially lost.    It is not necessary to state more particularly the manner in which the loss occurred.

The suit is brought to recover for this loss.    The cause of action, as I understand it, is founded substantially on an alleged failure of duty by the respondent as wharfinger, first in that it started the fire, by communicating oil to the pump house furnace; and if it did not so start the fire, then second, that it allowed oil to escape into the river, by means of which the fire was carried below and the Felix destroyed.    It is charged that the escape of oil resulted from carelessness; but it is claimed that the respondent is liable for its escape and the consequences, whether this charge is true or not.

Thus two primary questions of fact (omitting the allegation of negligence) are raised, the burden of proof respecting which is on the libelants: First. Did the respondent start the fire?    Second. Did the oil in the river escape from its pipes?

I have examined the testimony with care and am not satisfied that the libelants' allegation in either respect is proved; indeed I think the weight of evidence is the other way.    As a discussion of the testimony would be a useless as well as burdensome task, I will do no more than state my conclusions with a brief and general reference to the reasons on which they are founded.

As respects the first question it is not pretended that any one knows certainly how the fire started.    The libelants' allegation rests on inference.    Oil is said to have been seen running out from the cribbing of the wharf and the bank; and it is therefore conjectured

that the pipes leaked, and that the oil from them ran into the pump house, came in contact with the furnace fire and caused the explosion.    There is no room for doubt that oil was seen coming from the cribbing—though I believe the amount is greatly exaggerated by the libelants' witnesses who speak of it—but it is much more reasonable to believe that it was carried there by the wind and tide, than that it came from the pipes.    As the wind blew eastward and the water rose with the tide the oil on its surface would be carried up and into the bank and cribbing; and as the water receded the oil would trickle out and down, and continue to do so for a considerable time after the water had disappeared.    No oil was seen in the gas house before the fire, nor was any sign of its presence there found upon subsequent examination.    Witnesses say that such signs and traces would have been left if it had been there.    Some of the libelants' witnesses speak of the presence of oil "vapor" there before the fire.    This testimony however is not very satisfactory, and it is not suggested that this "vapor" caused the explosion.    If oil had come in, those in charge must, it would seem, have discovered it and called attention to the subject.    Its presence would have created serious danger and alarm; and the frequent previous explosions about the furnace and flues had so awakened inquiry for their cause that the presence of oil, even in the smallest quantity, could not have been overlooked.    No suggestion of its presence was made until after this fire.    Indeed it seems virtually impossible that oil should have leaked from the pipes in sufficient quantity to pass through the intervening impediments, and enter there in view of the care shown to have been exercised in guarding against leakage, and of the testimony respecting the condition of the pipes when subsequently uncovered, and the condition of the ground around them at that time.    To have gone there from the pipes it must have passed through considerably more than 100 feet of earth, and a thick retaining wall built back of the house, or passed under its foundation as well as that of the house, and then come up through a tightly cemented floor.    If the presence of oil were shown, it would seem much more reasonable to believe that it came from the river by washing in under the wharf, and through or under the wall of the house on that side.    The water and oil found in the well near the pump house constructed before the fire, as also that found in the trench and holes dug in the edge of the bank at the time of the fire, and subsequently, doubtless came from the river.    The openings made further back showed no oil.

There is no direct evidence that the explosion was caused by oil from any source.    Other highly inflammable substances were deposited in the river in that vicinity, by the gas works, which might as readily have caused it as oil, if brought into contact with the furnace fire.    As before stated, explosions had occurred there many times before, without a suggestion that they resulted from oil.    Their cause was sought for and attributed to defective construction of gas flues, and "back draft" caused thereby.    So confident was the belief in this theory that the construction was changed; but while the change seemed to diminish the number of explosions it did not en-

tirely avoid them. It seems to be much more reasonable to believe that the explosion which started this fire was caused by "back draft" than by oil. Indeed it was first attributed to this cause.

The trifling leak shown to have occurred in one of the pipes a few days before the fire, cannot have had any connection with the explosion. The oil would probably show at the surface, through the filling over the pipe, sooner than elsewhere: and as soon as it was discoverable there the pipe was closed. Of course it is evidence that oil pipes may leak, (which hardly requires proof) but the promptness with which this leak was stopped shows the vigilance of those in charge of this business.

As respects the second question what has been said in considering the first applies with equal force here. The evidence that oil was seen coming from the wharf cribbing and bank, standing alone and unexplained, might support the allegation that it ran from the pipes. Difficult as it would be to believe this, for the reasons before stated, the conclusion would probably be unavoidable. When, however, it is seen that oil is at all times floating on the river, which the tide and wind must carry up and into the cribbing and bank, the conclusion ceases to be either unavoidable or reasonable.

The libelants seem to suggest that the respondent's duty as wharfinger, required it to guard the vessel against danger from oil in the river from other sources, over which it had no control. Possibly I have misunderstood the argument in this respect. Certainly such was not its duty. The respondent was required to keep the wharf in as safe a condition as was reasonably practicable under existing circumstances—as safe as such wharves can, with ordinary care, be kept. It was an oil wharf, a place for loading and unloading such merchandise; and the testimony shows that the waters about such wharves are always, and unavoidably, partially covered with oil— resulting from the washing of tanks, escape in loading, and other similar causes. The Felix undertook to carry oil, which she could only get by going to such a wharf. She must have expected to find oil on the water there, and she saw it there as she approached. Whatever risk arose from its presence, (without the respondent's fault,) she assumed for the sake of the expected profit.

In this view of the facts the important questions of law discussed by counsel need not be considered. The libel must be dismissed, with costs.